# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **HARVEST OIL & GAS, LLC, ET AL.** | **\*CIVIL NO. 6:11-0714** |
| **VERSUS** | **\*MAGISTRATE JUDGE HILL** |
| **BARRY RAY SALSBURY, ET AL.** | **\*BY CONSENT OF THE PARTIES** |

## REASONS FOR JUDGMENT

This case was tried to the Court, without a jury. During trial, the Court dismissed the plaintiffs' fraud and negligent misrepresentation claims pursuant to Rule 52(c), F.R.C.P for the reasons stated on the record.  Accordingly, only the plaintiffs' breach of contract claim and the defendants' malicious prosecution and attorneys' fee counter-claims remain pending.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

After due consideration of the facts, the stipulations of the parties and evidence which was presented by the parties at the trial of this matter through live witnesses, exhibits and deposition testimony, and having had the opportunity to assess the demeanor of the live witnesses, and review and weigh the evidence, the Court hereby makes the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, which the Court finds and holds were established by a preponderance of the evidence.[1]

---

[1]To the extent that any finding of fact constitutes a conclusion of law, the Court hereby adopts it as such, and to the extent that any conclusion of law constitutes a finding of fact, the Court hereby adopts it as such.

**CONCLUSIONS OF LAW**

### Breach of Contract

The essential elements of a breach of contract claim are (1) the obligor's undertaking an obligation to perform, (2) the failure of the obligor to perform the obligation (the breach) and (3) the failure to perform resulted in damages to the obligee. *Favrot v. Favrot*, 68 So.3d 1099, 1108-09 (La. App. 4th Cir. 2011).

"An obligor is liable for the damages caused by his failure to perform a conventional obligation. A failure to perform results from nonperformance, defective performance, or delay in performance." La. C.C. Art. 1994.

If the obligee has proven a failure to perform an obligation which has caused the obligee to sustain damages, the Court then inquires as to whether the obligor failed to perform in good faith or in bad faith, which in turn determines the extent of the obligee's recoverable damages. *Favrot,* at 1109. "An obligor in good faith is liable only for the damages that were foreseeable at the time the contract was made." La. Civil Code Art. 1996. By contrast, "[a]n obligor in bad faith is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform." La. Civil Code Art. 1997.

"Foreseeable damages are such damages as may fall within the foresight of a reasonable man. In distinguishing foreseeable from unforeseeable damages, the court should consider the nature of the contract, the nature of the parties' business, their prior dealings, and all other circumstances related to the contract and known to the obligor. Any special circumstances

made known to the obligor by the obligee should also be taken into account."  Article 1996, Revision Comments – 1984 (b).

"An obligor is in bad faith if he intentionally and maliciously fails to perform his obligation."  Article 1997, Revision Comments –1984 (b). Thus, "[t]he term bad faith means more than mere bad judgment or negligence, it implies the conscious doing of a wrong for dishonest or morally questionable motives." *MKR Services, L.L.C. v. Dean Hart Constr., L.L.C.*, 16 So.3d 562, 566 (La. App. 2nd Cir. 2009).  "Bad faith generally implies actual or constructive fraud or a refusal to fulfill contractual obligations, not an honest mistake as to actual rights or duties." *Delaney v. Whitney Nat'l Bank*,  703 So.2d 709, 718 (La. App. 4th Cir. 1997).

**Malicious Prosecution**

It is well settled that actions for malicious prosecution have never been favored and, in order to sustain them, a clear case must be established, demonstrating that "the forms of justice have been perverted to the gratification of private malice and the willful oppression of the innocent."  *McClanahan v. McClanahan*, 82 So.3d 530, 535 (La. App. 5th Cir. 2011) *citing Johnson v. Pearce*, 313 So.2d 812, 816 (La. 1975).

The elements of a malicious prosecution action are: (1) the commencement or continuance of an original criminal or civil judicial proceeding; (2) its legal causation by the present defendant in the original proceeding; (3) its bona fide termination in favor of the present plaintiff; (4) the absence of probable cause for such proceeding; (5) the presence of

malice therein; and (6) damage conforming to legal standards resulting to plaintiff. *Jones v. Soileau,* 448 So.2d 1268, 1271 (La.1984).  Strict compliance with all essential elements is required.  *McClanahan* at 530.

Probable cause depends not upon the actual state of the case in point of fact, but on the honest and reasonable belief of the party instituting the litigation. *McClanahan* 82 So.3d at 534-535 *citing Eusant v. Unity Industrial Life Ins. & Sick Benefit Ass'n of New Orleans*, 195 La. 347, 353, 196 So. 554, 556 (1940); *Jones,* 448 So.2d at 1272.  Stated differently, "probable cause to file suit is a question which depends upon the particular facts as perceived by the person bringing the action." *Hibernia Nat. Bank of New Orleans v. Bolleter*, 390 So.2d 842, 843-844 (La. 1980).  However, "public policy requires that all persons have the right to resort to the courts for redress of wrongs, and the law protects them when they act in good faith and upon reasonable grounds in commencing a civil proceeding." *Id.* at 844 *citing Johnson v. Pearce*, 313 So.2d 812 (La.1975).

"Malice may be inferred from the lack of probable cause or inferred from a finding that the defendant acted in reckless disregard of the other person's rights." *Miller v. East Baton Rouge Parish Sheriff's Dept*., 511 So.2d 446, 453 (La. 1987) (citations omitted).  Where there is a lack of probable cause resulting from "wanton and reckless disregard of the rights of the party sued, evincing absence of that caution and inquiry a party should employ before filing suit, malice will be inferred." *Jones,* 448 So.2d at 1273 *quoting Hibernia  National Bank*, 390 So.2d at 844.

-4-

Damages are presumed when the other five elements are established. *Jones,* 448 So.2d at 1273 *citing Hibernia National Bank, supra.*  Although the trial judge has "much discretion" in assessing damages in the case of an offense or *quasi* offense, only compensatory damages may be awarded in malicious prosecution suits. *Jones,* 448 So.2d at 1243 *citing Robinson v. Goudchaux's,* 307 So.2d 287, 291 (La. 1975).

**FINDINGS OF FACT**

On April 1, 2007, Harvest Oil & Gas, LLC ("HOG") and The Harvest Group, LLC ("THG") entered into a contract with Professional Oil & Gas Marketing, LLC ("POGM"), a single member Louisiana liability company owned by Henry Calongne ("Calongne"), (collectively "the defendants") under which POGM was granted the exclusive right to market oil and gas on behalf of HOG and THG.  The contract contains a list of services which were to be provided by POGM, including that POGM "calculate and pay any and all government/non-government royalties, severance taxes and any other government fees."  The contract provides a primary term through March 31, 2010, continuing on a year to year basis thereafter unless cancelled by either party giving at least ninety days advance written cancellation notice.

In October, 2007, Saratoga Resources, Inc. ("Saratoga") agreed to purchase all of the membership interests in HOG and THG; assignments of these membership interests to Saratoga were executed in July, 2008.  After the sale, the contractual arrangement between POGM and HOG and THG continued in effect. Saratoga, HOG and THG are referred to below, collectively, as "the plaintiffs."

Under the purchase agreement, Saratoga was to conduct a due diligence investigation, including the analyzation of "material contracts" such as employment agreements and oil, gas and mineral leases.  *See* P9 and P11, ¶ 3.12(ii) and (vi), 5.11, 7.01(a) and 7.03(a).  Although Saratoga had various professionals to assist with this task, prior to the acquisition by Saratoga, Calongne testified that no one from Saratoga contacted him regarding his duties, or how he functioned, under the contract or asked how he made the contractually required calculations. Andrew Clifford ("Clifford"), President of Saratoga, testified that Saratoga could have, but chose not to, ask Calongne whether he was or was not deducting marketing fees prior to calculating royalties due to the State.  Likewise, Barry Creel ("Creel") of Creel and Associates (who was hired by THG, HOG and subsequently Saratoga to do production allocations), testified that he was not contacted in regards to the services he rendered; rather, Creel testified that he was told his work was to be continued as "normal."

Clifford also testified that Saratoga could have, but chose not to, examine the leases which were being acquired by Saratoga to determine whether royalties were due on lease use fuel, nor was landman Roger Pecoraro, who assisted with the acquisition, asked to review the leases which were being acquired by Saratoga to give an opinion as to whether royalties were due on lease use fuel.  For these reasons, although plaintiffs claimed that they did not know how POGM and Calongne calculated royalties and severance taxes or the information that was needed to perform those calculations, had Saratoga performed a more thorough due diligence investigation, Saratoga could easily have gained this information. The Court was provided with

no explanation why the "due diligence" investigation did not even seek this information.

The contract was negotiated on behalf of HOG and THG by Beau Sibley, and on behalf of POGM by Calongne.  Sibley did not testify at trial.  Thus, the uncontradicted testimony regarding the intent, meaning and interpretation of the contract at its inception was that given by Calongne, who the Court found credible on this subject.  Calongne testified that under the contract, the term "calculate" meant that he was to do a simple mathematical calculation based on information provided to him by the producer or a landman hired by the producer.  He was not responsible for examining leases, creating a royalty deck or determining the tax status of any individual well.  That information was to come from the producer, initially THG and HOG and, thereafter, Saratoga, or a landman or other third party hired by the producer.

Darnell "Dee" Abadie ("Abadie"), the defendants' expert in the area of oil and gas production and operation (including accounting, allocation, sale and marketing of oil and gas and calculation and payment of related fees, compliance, royalties and taxes), concurred with Calongne's testimony.  Abadie defined the term "calculate" as referring to the use of an arithmetic formula to come up with a value.  Abadie testified that creation of a royalty deck and the review of leases was the responsibility of the producer, usually through its land department, or the use of a landman hired by the producer. The status of a well was determined by the producer through the use of a production department, which monitors production, or by an accountant hired by the producer, not a marketer or the person charged with calculations of royalties or severance taxes.

-7-

The Court finds the testimony of Calongne and Abadie on these points credible, and accepts this testimony as fact.

Based on the testimony of Calongne and Abadie, the Court finds that as a matter of industry practice, the information used by marketers and persons tasked with calculating the amount of royalty payments and severance taxes is supplied by the producer or third parties hired by the producer, such as a landman.  It is also the responsibility of oil and gas producers to assure that the information so provided is accurate and reliable.[2]  Marketers and persons tasked with making the calculations are not responsible for investigating, compiling or creating data bases used to calculate royalties and severance taxes.[3]  As oil and gas operators and producers, Saratoga, HOG and THG are charged with knowledge of these industry practices, as well as the duties and responsibilities of landmen, marketers and  persons tasked with calculating the amount of royalty payments and severance taxes.  The Court finds that testimony presented by the plaintiffs to the contrary, including that given by Clifford and Daigle, was not credible.  Finally, the Court finds that the contract at issue herein is properly interpreted in accordance with these industry practices.

On March 31, 2009, Chapter 11 proceedings were filed by Saratoga, HOG and THG.

On April 2, 2009, Saratoga, HOG and THG filed an Application seeking Bankruptcy Court approval of  the contract between them and POGM, so as to allow POGM to continue its oil and gas marketing services. [#09-50397, rec. doc. 19].  The Bankruptcy Court ultimately

---

[2]The deposition testimony of Daniel C. Douglas, Jr. and Elden "Denny" Otillio also supports this finding.

[3]*See Id.*

-8-

approved the contract. [*Id.* at rec. docs. 45, 170 and 182]. Accordingly, POGM continued to market oil and gas on behalf of Saratoga, HOG and THG under the contract.  During the pendency of the Bankruptcy proceeding, POGM's marketing efforts generated approximately $63 million dollars in revenue.

POGM applied for interim fee allowances, all of which, excepting only the last such request, were approved by the Bankruptcy Court, without objection. On Motion for Partial Summary Judgment, this Court awarded POGM its final fee application.

On December 29, 2009, the plaintiffs gave POGM the contractually required ninety-day Notice of their intent to terminate the contract with POGM.

**1. Underpaid Royalties**

POGM computed the amount of royalty payments due the State for the period April 1, 2007 through July 2009.  POGM  used the royalty decks provided by the plaintiffs to compute the royalty payments due to the State. The creation of these royalty decks was not the responsibility of POGM under the contract, nor was POGM contractually required to update the royalty decks provided. Rather, the evidence demonstrated that the creation of the royalty decks was the responsibility of the producer, in this case, HOG, THG and Saratoga. There was no testimony to the contrary.  All witnesses agreed that royalty decks are created by the producer or landmen hired by the producer.

In June 2009, the State of Louisiana began conducting an audit of oil and gas payments made by HOG and THG for periods beginning in 2005 through March 2009.  During this time, the State informally advised Brian Daigle ("Daigle"), Vice-President of Operations for

Saratoga, that improper royalty deductions were taken.

On October 14, 2009, the State issued its final audit report in which it determined that HOG and THG owed over one million dollars in unpaid royalties as a result of improper deductions for lease use fuel and POGM's marketing fees.  The State waived penalties associated with these under-payments and allowed the funds to be re-paid, with interest, under an installment payment plan.

For the reasons which follow, POGM cannot be held responsible for the underpayment of royalties.

## A.  Lease Use Fuel

Whether lease use fuel may be deducted prior to computation of royalty payments depends on the language contained in each lease; some leases allow for this deduction, some do not; some leases are not specific concerning the issue.  POGM did not review any of the mineral leases at issue to determine which leases permitted deduction of lease use fuel before computing royalty payments.  However, the evidence established that POGM was not responsible for undertaking such review, as that responsibility lies with the producer, or his agent, normally a landman.  POGM was therefore not required to research each lease to determine if lease use fuel could, or could not, be deducted prior to determining the royalty payment due the State.  POGM properly relied on the information provided to it and that contained in the royalty decks provided by plaintiffs, and their landman, to calculate State royalty payments. POGM therefore committed no error or breach of contract.

-10-

The Court's finding in this regard is supported by the testimony of  plaintiffs' accountants, Elden "Denny" Otillio ("Otillio") and Daniel C. Douglas, Jr. ("Douglas") who testified, like Calongne, that they do not develop the information used to calculate royalty payments and, more specifically, do not conduct a lease by lease investigation to determine which leases allow, or do not allow, for lease use fuel deduction.  They further testified that they depend on royalty decks created by landmen to make their calculations.  Likewise, even Barry Creel testified that landmen typically review leases and provide information contained in leases to the producer, such as whether lease use fuel may be deducted and, further, that accountants and marketers rely on revenue decks provided to them to calculate royalties. While Creel also testified that had his company been retained to calculate royalties he would have obtained the leases for review, the Court does not find that testimony credible, as it conflicts with other credible evidence on this issue.

The Court's finding is additionally supported by testimony regarding a meeting, initiated by Calongne, which occurred on March 7, 2007.  During this meeting, the issue of lease fuel deductions was discussed by the parties.  However, it is undisputed that no directive requiring Calongne or POGM to review leases was ever issued.  Moreover, it is undisputed that the contract at issue herein, executed after this meeting took place, does not expressly require Calongne or POGM to review leases.  As such, the Court cannot find that there was ever any contractual agreement requiring Calonge or POGM to undertake this responsibility.

The Court's finding is further supported by the events which transpired after the State began its audit, in June 2009, when Daigle was informally advised by the State that royalties were improperly not being paid on lease use fuel. Daigle asked a landman, Roger Pecoraro ("Pecoraro"), to review the State's leases and render an opinion as to the deductibility of lease use fuel; he did not ask Calongne or anyone else associated with POGM to undertake this task. *See* D2. Pecoraro issued his response by written formal memorandum on June 12, 2009. *See* D3. That response was forwarded to Calongne, who then forwarded it to his associate Barbara Brunet, to incorporate this information when making royalty calculations. *See* D2. Thus, just as Calongne testified, the information as to whether lease fuel was exempted from the payment of State royalties was ultimately provided by the producer, Saratoga, to POGM, after a landman hired by the producer, Pecoraro, reviewed the State leases.

**B. Marketing Fees**

At the time POGM was under contract, both Calongne and defense expert Darnell "Dee" Abadie testified that deducting marketing fees before calculating royalties was the long-standing industry practice. In accordance with this standard industry practice, POGM deducted marketing fees before calculating royalties. It was not until mid-2009, around the same time that the State was conducting its audit of HOG and THG, that the State took issue with that practice. Calongne testified that he became aware of the State's newly asserted position on the non-deductibility of marketing fees in March 2009. Thereafter, Calongne discontinued taking this deduction, even though the deduction had previously been taken in accordance with long-standing industry wide practice. POGM was no longer responsible for calculating royalties

-12-

after the State's audit was completed.  POGM (and Calongne) therefore did not deficiently perform its contractual obligations by calculating royalties, during its tenure, in accordance with the then common and prevailing standard industry practice. POGM and Calongne therefore committed no breach of contract.

The Court's finding is bolstered by examination of the State Handbook (P54) which does not expressly prohibit taking a deduction for marketing fees.  Moreover, Creel testified that post-production costs are deducible, and did not disagree that marketing fees could be viewed as a post-production cost.  Accordingly, Creel testified that Saratoga could have challenged the position taken by the State in its audit, but apparently chose not to do so.

Furthermore, it is clear that all underpaid royalties were, at all times, the property of the State, not plaintiffs.  Therefore, plaintiffs incurred no damage when they were required to repay these amounts.  To the contrary, plaintiffs benefitted by any alleged error by having possession and use of the funds for several years prior to payment to the State.  Finally, any interest paid by plaintiffs to the State on these funds was clearly offset by their possession and use of the funds during the pre-payment period.

For these reasons, POGM cannot be held liable for underpaid royalties or the interest paid by plaintiffs on these underpaid royalties.

**2.  Severance Taxes**

After the State audit, the plaintiffs also discovered that severance taxes were being overpaid on certain wells which were eligible for a well classification status which would result

in a lower tax rate. The evidence established that POGM was not responsible for determining the status of any oil or gas well for purposes of computing the amount of severance taxes due the State.  Severance taxes are paid based primarily on well status, which determines the applicable tax rate.  POGM's severance tax calculations were based on reports and information supplied to POGM by plaintiffs and persons hired by plaintiffs.  That information was included on O3 and G3 forms which stated the status of each well, based on production.

Examples of these forms, which had been provided to POGM thereby prompting a change by POGM in the severance tax rate of the affected wells, were admitted into evidence. *See* D11-13.  POGM was not responsible for developing the information contained on the forms or for submitting the required forms to the State for change of well status approval. Rather, under the contract, POGM was merely responsible for performing a simple arithmetic function based on information, including the well status information, provided to it.  Thus, POGM did not breach the contract in question.

This finding is supported by the testimony of plaintiffs' accountants, Otillio and Douglas, who were responsible for the severance tax calculations beginning in August, 2009, after POGM no longer performed that service.  They, like POGM, overpaid severance taxes employing the same methodology as POGM, based on the information provided to them by Saratoga or persons hired by Saratoga.

Furthermore, after the well classification status was corrected by a third party contracted by the plaintiffs, Entertax, the State refunded all overpaid severance taxes for the time period in

-14-

which POGM was tasked with the calculations, and also for the time period in which plaintiffs'
own accountants, Otillio & Associates, LLC, were making these calculations, a sum of over $5
million dollars, along with interest at the effective rate of 4%.   Accordingly, Otillio and
Douglas testified by deposition that plaintiffs were not damaged by the overpayment of
severance taxes.  The Court agrees.

Entertax charged a 33.33% contingency fee to recover these funds.  However, the
decision to engage Entertax was a business decision by the plaintiffs; the appropriate
paperwork could have been filed by Creel, who testified that he provides this service for his
clients, presumably at a lesser hourly rate, or by Calongne, who testified that he could have
filed the necessary paperwork at no additional cost.  Indeed, Calongne gave, as an example, a
producer he knew who had done exactly that.  Accordingly, the Court additionally, and in the
alternative, finds that POGM should not be held responsible for the payment for these services.

For these reasons, POGM cannot be held responsible for the overpayment of severance
taxes or the funds paid by plaintiffs to Entertax.  POGM did not breach the contract in question,
nor were the plaintiffs damaged as a result of the overpayment of severance taxes.

## 3.  Malicious Prosecution

In light of the above, the first three elements of the defendants' (counter-claimants')
malicious prosecution claim are proven.  However, for the reasons which follow, the fourth and
fifth elements, the absence of probable cause and malice, have not been proven.  Accordingly,
no damages are awarded to POGM and Calongne as counter-claimants on this claim.

-15-

Based on all of the evidence presented, the Court cannot find that the plaintiffs lacked an honest and reasonable belief that POGM and Calongne were responsible for their alleged damages.  Thus, a lack of probable cause has not been shown.  To the contrary, it is clear that the plaintiffs, acting in good faith, presented this Court with a bona fide dispute regarding the responsibilities and obligations undertaken by POGM under the subject contract.  Absent a trial, at which a number of persons testified (seven live and two by deposition) and numerous exhibits were admitted (a total of 82), this determination could not have been made.  Although the Court ultimately decided the case in accordance with the interpretation urged by POGM and Calongne, this Court cannot, by finding in their favor, essentially deny the plaintiffs their right to have resorted to this Court to make that determination.  This is particularly true given the disfavor that actions for malicious prosecution have traditionally been accorded.

Furthermore, malice has not been established.  Malice cannot be inferred because the Court finds that probable cause for the initiation of this lawsuit was not lacking.  Nor, from the evidence presented, can this Court find that the plaintiffs wantonly or recklessly disregarded the rights of Calongne or POGM by seeking judicial resolution of this *bona fide* dispute.

In sum, the evidence failed to establish that "the forms of justice have been perverted to the gratification of private malice and the willful oppression of the innocent." *McClanahan*, 82 So.3d at 535 *citing Johnson*, 313 So.2d at 816.

## 4.  Attorney's Fees and Costs

POGM seeks attorney fees and expenses incurred in defending its fee application.  The Court has found no authority for awarding fees for a court approved fee application under 11

U.S.C § 328.  In support of this claim, POGM relies solely on *In re ASARCO LLC,* 2013 WL 1292704 (S.D. Tex. 2013).  However, shortly after the trial was concluded, the award of fees in *In re ASARCO LLC* was reversed by the Fifth Circuit on appeal.  *In re ASARCO LLC* , 751 F3d 291 (5th Cir. 4/30/2014).  Although *In re ASARCO LLC* involved a fee application under 11 U.S.C § 330 (where the court determines a reasonable fee), not § 328 (where the fee is pre-approved) as in this case[4], the Court finds that the reasoning of the Fifth Circuit in *In re ASARCO LLC* precludes an award of attorney's fees and expenses to POGM in this case.[5]

    *In re ASARCO LLC* clearly holds that the Bankruptcy Code does not authorize compensation for the costs counsel or professionals bear to defend their fee applications and that fees for defense of a fee application are not compensable from the debtor's estate.  *Id*. at 299-300.  While the Fifth Circuit reaffirmed the Court's inherent power to implement the exception to the "American Rule" that allows fee shifting where an adverse party has acted in "bad faith, vexatiously, wantonly, or for oppressive reasons" (*Id.* at 300 *citing Chambers v. NASCO, Inc*., 501 U.S. 32, 45–46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991)), the threshold for invoking this inherent power is high (*Spring v. Beverly Enters. Mississippi, Inc.,* No. 99–60174, 2000 WL 178163, at *5 (5th Cir. 2000) (unpublished); *Maguire Company v. City of Houston*, 143 F.3d 205, 209 (5th Cir. 1998)), and the Court should invoke it only when it finds that "a

---

[4]This Court has previously found that the contract was approved under 11 U.S.C. § 328, although the Order approving the contract refers to § 330.

[5]The Court notes that the United States Supreme Court has granted *certiorari*, and oral argument is scheduled for February 25, 2015. *See Baker Botts, LLP v. ASARCO, LLC,* 135 S.Ct. 44 (10/2/2014). The Court has decided not to delay this Ruling in order to await the Supreme Court's decision on this issue.

fraud has been practiced upon it or that the very temple of justice has been defiled." *Boland Marine & Mfg. Co. v. Rihner*, 41 F.3d 997, 1005 (5th Cir. 1995) *quoting Chambers*, 501 U.S. at 46, 111 S.Ct. at 2133.  That showing has not been made in this case.

For these reasons, POGM and Calongne will not be awarded any attorney's fees or expenses they incurred in defending their fee application.

For the reasons set out above, the Court finds that the plaintiffs are not entitled to recover damages from the defendants and the defendants (as counter-claimants) are not entitled to recover damages or attorney's fees and expenses from the plaintiffs. Accordingly, all remaining claims are dismissed with prejudice.

Because no party can be said to have prevailed, each party is to bear its own costs.

The parties shall submit a Judgment to the Court in accordance with the above findings and conclusions within seven (7) days, approved as to form by both parties.

February 16, 2015, Lafayette, Louisiana.

C. Michael Hill
C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE